Argued January 29; reargued March 24; reversed April 7, 1936

# WENTWORTH & IRWIN, INC., *v.* SEARS

(56 P. (2d) 324)

202

*Will H. Masters,* of Portland, for appellant.

*Howard P. Arnest,* of Portland, for respondent.

BAILEY, J. The principal question here involved is whether the loss of anticipated profits on employment of two trucks for gravel hauling, of which profits the defendant claims to have been deprived by termina-

tion of the employment, is the proper measure of defendant's damages against plaintiff, the vendor of one of such trucks, for breach of implied warranty of quiet possession of the truck.

On July 9, 1930, the plaintiff sold to the defendant one used G M C motor truck on a conditional sale contract for the purchase price of $3,237.40, upon which the defendant at the time of sale paid $1,073.88 in cash. The contract provided that in the event the monthly payments were not made as therein specified the plaintiff might repossess the truck, sell the same and apply the amount received from such sale on the balance due on the contract, and in case of a deficiency, the defendant agreed to pay the amount thereof to the plaintiff.

Default was made in three monthly installments and the truck was repossessed by the plaintiff and sold for $388.94 less than the amount of the balance due on the purchase price. This action was brought to recover the deficiency, together with $85.67 for material and services furnished by the plaintiff at the instance of the defendant.

As a counterclaim, the defendant, after admitting the purchase of the truck, the making of initial payment thereon and the execution of a conditional sale contract providing for the balance of the payment in monthly installments, alleged that at the time of executing such contract the plaintiff knew that the defendant was dependent upon his ability "to use and possess such truck in performance of contracts for hauling highway surfacing material in order to perform such contract and in order" to pay for said truck; and that the plaintiff at the time of executing the conditional sale

contract warranted to defendant that the truck was then "free from any charges or encumbrances" and that the defendant would have and enjoy the quiet possession of said truck as against any lawful claims then existing.

The defendant further alleges that after taking the truck on the conditional sale contract he "secured a contract from one Milne-Dussault Company . . . to furnish two trucks with drivers for hauling crushed rock" on a highway project near Neskowin, Oregon, for 15 cents per yard mile, to begin about September 1, 1930; and that defendant entered upon the performance of that work and continued to haul crushed rock for the said company until October 6, 1930. At that time, according to the allegations of the answer, the sheriff of Tillamook county took possession of said truck to foreclose a valid mechanic's lien which had existed against the truck when defendant purchased the same. The defendant further avers that he was thereby deprived of the use of the truck from October 6 to 10, 1930; that due to the seizure of said truck he "was unable to furnish two trucks in accord with his hauling contract and unable to perform his contract with said Milne-Dussault Company, for which reason said contract was terminated by said company and other trucks put on said job"; and that by reason of such termination of his employment the defendant was damaged in the sum of $23,400, "less only such sum, if any, as may be found owing to plaintiff as the balance of the purchase price of said truck after its repossession by the plaintiff and application of its reasonable value thereon".

The plaintiff in its reply put in issue the allegations in defendant's counterclaim and affirmatively

alleged that one Campbell had, prior to the sale of the truck to defendant, filed a notice of lien against the truck for $240.10, due as payment for two truck tires, and that pursuant to said notice of lien the sheriff of Tillamook county on October 6, 1930, had taken possession of the truck; that immediately upon receiving notice from the defendant, the plaintiff, on October 8, filed a denial of the lien and gave an undertaking to release said truck; and that the truck was released and returned to the defendant, who retained it until December 8, 1930, when it was repossessed by the plaintiff for failure of defendant to make payments on it as required by his contract.

The case was tried to the court and a jury, and from judgment entered upon a verdict in favor of the defendant for $1,000 the plaintiff has appealed.

The defendant testified that early in July, 1930, he went to plaintiff's place of business in Portland to ascertain whether any of plaintiff's employees would furnish a truck and his services and join defendant in hauling road materials on a construction job on the Bend-Burns highway, under a contractor named Young. Defendant then owned one truck and wanted some one to join him because the offer of work was for two trucks and drivers. No one connected with the plaintiff's business cared to join in the work. The defendant, however, was persuaded by plaintiff to buy a second truck and hire a driver, and as a result he bought from plaintiff the truck here involved.

Both trucks were used by defendant on the Bend-Burns highway job for approximately one month. He then took a hauling job under one Marston, on the Mt. Hood Loop highway, and after that was employed

hauling sand and gravel in county work in and about Portland.

About September 1 defendant was given work by the Milne-Dussault Company, the contractor in charge, for his two trucks, hauling road materials on the Otis-Neskowin section of the Oregon Coast highway. The company had five trucks of its own and three others on the job that were given preference in this hauling. There was no definite contract between the defendant and the company as to the length of time the defendant's trucks would be used, but it appeared that there would be work for these two trucks for approximately two months. The contractor did not agree to use them for that length of time, or any other definite period, nor did defendant agree to furnish the trucks for any stated time.

The defendant began hauling materials on this job about September 5, and on October 6 the following occurred, according to defendant's witness Kissinger, who was in charge of construction for the Milne-Dussault Company and who thus testified:

"The trucks worked in the forenoon and the forepart of the afternoon [of October 6] and towards evening the state officer came up and said, if I wanted any more trucks I should call Portland, because he was tying up Mr. Sears's two trucks. So, I called Portland that night and Mr. Milne sent out some more trucks the next day."

The other truck owned by the defendant, which had not been sold to him by the plaintiff, worked on October 9 and 10, and on the latter date the truck bought from plaintiff was released by the sheriff of Tillamook county upon plaintiff's filing an answer to the foreclosure proceedings and giving a bond for the release of the truck.

The evidence is undisputed that this truck, prior to the sale to the defendant, had been sold to and used by another purchaser who while he had possession of it bought two tires for it and did not pay for them, with the result that notice of lien had been filed against the truck. There was no dispute as to the validity of the lien.

In order to prove damages alleged to have been suffered by him through the seizure of the truck by the sheriff, the defendant contended that such seizure resulted in the termination by Milne-Dussault Company of his employment to use two trucks in hauling road material, and that by such termination of employment he suffered a loss to the extent of his anticipated profits on said road work. Testimony was presented on defendant's behalf showing what his profits had been on the work of both trucks from the time he took such employment on September 5 to the seizure of the truck by the sheriff on October 6. The jury was instructed by the court to ascertain, based on that evidence, the amount of damages which the defendant suffered by being prevented from continuing the highway work until completion of the hauling in which he was engaged.

■ When the plaintiff sold to the defendant the GMC truck there was an implied warranty that the defendant should have and enjoy the quiet possession of such truck against any lawful claim existing at the time of the sale, and the additional implied warranty that the truck was "free at the time of the sale from any charge or encumbrance in favor of any third person, not declared or known" to the defendant "before or at the time when the contract of sale" was made: § 64-313, Oregon Code 1930.

Where there is a breach of warranty by the seller a buyer has at his election one of four remedies: (1) to accept or keep the goods and set up against the seller the breach of warranty by way of recoupment, in diminution or extinction of the purchase price; (2) to accept or keep the goods and maintain an action against the seller for damages for breach of warranty; (3) to refuse to accept the goods, if the property therein has not passed, and maintain an action against the seller for damages for breach of warranty; or (4) to rescind the contract to sell or the sale and refuse to receive the goods, or, if the goods have already been received, return them or offer to return them to the seller, and recover the price or any part thereof that has been paid. Where the buyer has claimed and been granted any one of these remedies no other remedy can thereafter be granted: § 64-707, subsections 1 and 2, Oregon Code 1930.

In the case before us the defendant elected to keep the truck involved and maintain an action in the nature of a counterclaim against the plaintiff for damages for the breach of warranty of quiet possession. He could, however, when his truck was seized by the sheriff of Tillamook county to foreclose a mechanic's lien, have returned the truck or offered to return it to the plaintiff and then have recovered the amount which he had paid on the purchase price of the truck. There is some evidence in the record to the effect that on October 11, 1930, after the truck had been released by the sheriff, the defendant went to the plaintiff's place of business in Portland and offered to return the truck. His testimony concerning this matter is as follows:

"I told him [Mr. Irwin of Wentworth & Irwin] that I had received a damage down there, and of course

then I didn't know how much, because I didn't know how long the job would last then, and I didn't say how much, only told that I couldn't pay for the truck, couldn't go ahead paying for the truck. I couldn't even make that payment that was due after I had received the truck back, which was not due when the truck was seized, and that I had no job to go on to, and I didn't get any more jobs to go on to with that truck or the other truck until along in the next summer early."

It is apparent from the defendant's procedure herein that he was relying upon the second alternative above mentioned, *i. e.,* to keep the truck and maintain an action for damages for the breach of warranty of quiet possession. The measure of his general damages, therefore, for the breach of such warranty, "is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty": § 64-707, supra.

In Mariash on Sales, § 348, at page 686, we find this statement:

"The warranty of title consists of three independent warranties of quiet possession, freedom from encumbrance, and the right to sell the goods. If the breach of warranty of title is caused by an encumbrance upon the title, the damages would be the cost of removing the encumbrance, or the difference between the value of the goods with and without the encumbrance. Loss of quiet possession may result from the assertion of an adverse claim to the goods by a third party or by an action being brought by such person in replevin or conversion. If the buyer's title is wholly defeated, his damages are the full market value of the goods."

In 2 Sedgwick on Damages (9th Ed.), § 774, page 1618, it is said:

"The warranty of the title is often construed by courts as equivalent to a warranty of quiet enjoyment, usually given in sales of realty. Under such a view no

cause of action accrues, until the vendee has been dispossessed by the true owner. And it would seem that the damages would be measured by the value of the chattel.

"The general rule is that the measure of damages for breach of a warranty of title to a chattel is the value of the chattel at the time of the purchase, with interest, and the necessary costs of defending a suit brought against the vendee to test the title, with interest from the time of payment. Many cases, however, lay down the rule that the measure of damages is not the value but the price paid for the goods. Such cases may be explained on a variety of grounds. The rule is quite consistent with the tort-origin of the action for breach of warranty and this is perhaps the only theoretical justification. On the other hand, even when the measure of damages usually applied in actions of assumpsit is followed, the price paid is very good evidence of the actual value of the chattel. It may even be treated as *prima facie* evidence. Finally, the courts may have confused the right to sue for breach of warranty with his right to rescind. For the vendee may disaffirm the contract and recover the consideration paid, though that is greater than the value of the property. * * * Where there is not a total failure of title, but only an incumbrance, the measure of damages is the amount the vendee was compelled to pay to protect his possession.''

In 55 C. J., § 868, at pages 890 and 892, the rule is thus stated:

"On a breach of the warranty of title the measure of damages is, according to the rule laid down in some jurisdictions, the value of the property with interest. In other jurisdictions, however, it is held that the measure of damages is the price paid, with interest thereon, from the date of purchase or payment, or from the time of dispossession, and such other damages as necessarily arise out of the transaction. * * * * *

"Where there is an encumbrance on the title, the buyer is entitled to recover only the amount paid to

clear the title, together with costs incurred in defending the foreclosure suit, and a reasonable attorney's fee, provided the seller was requested to defend the action.''

■ Under the provisions of § 64-707, supra, the defendant was entitled to recover from the plaintiff as damages for breach of warranty of quiet possession "the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty". It is obvious that the damages which defendant is here seeking to recover are not such as directly and naturally result, in the ordinary course of events, from a breach of warranty of quiet possession. The mechanic's lien on the truck was satisfied and discharged by the plaintiff and nothing was paid by the defendant to the lien claimant, or on the expenses incurred by the lien claimant or for attorneys' fees in defending the right of Sears to possession of the truck. Being deprived of the use of the truck from the time it was seized in the afternoon of October 6 to sometime in the tenth day of the same month was the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty of quiet possession and freedom from encumbrance.

Section 64-708, Oregon Code 1930, is as follows:

"Nothing in this act shall affect the right of the buyer or the seller to recover interest or special damages in any case where by law interest or special damages may be recoverable, or to recover money paid where the consideration for the payment of it has failed.''

■ It is under this section, rather than § 64-707, subsection 6, that the defendant, under his theory of the case, would be entitled to recover, if at all. In other words, it is by way of special rather than general damages that recovery may be had for the loss of antici-

pated profits. The arrangement which defendant had with Milne-Dussault Company for hauling gravel on the coast highway can not by any construction of its terms be interpreted as a contract between the defendant and that company. If he could not recover anticipated profits for breach of a contract, much less could he recover anticipated profits based on the informal working arrangement he had with the Milne-Dussault Company. Hence, we shall not be overlooking any of defendant's rights when, for the purpose of argument and for the better expression of our views, we discuss that arrangement as though it were a binding contract for a definite period of time.

■ ■ This, therefore, is the question to be decided: Is the defendant entitled to recover for loss of anticipated profits on a collateral agreement entered into subsequent to the time of the sale of the motor truck by plaintiff to him, which collateral agreement was not in existence or even in contemplation of the parties? In order to recover special damages—and anticipated profits on a collateral agreement would be recoverable, if at all, only as special damages—such special damages must be pleaded and proved.

■ ■ The law reads into contracts for the sale of personal property for the use of the purchaser an implied warranty as to quiet possession and provides the measure of damages for breach of such warranty. If damages other than those specifically provided by law are sought to be recovered for breach of warranty, then the demand must be based upon some understanding between the vendor and the vendee other than the mere contract of sale. And this understanding or agreement between the parties must be alleged with sufficient clearness to permit introduction of evidence of its ex-

istence. Although it may not be expressly admitted by counsel for the defendant, nevertheless it apparently is assumed by him in his brief and on oral argument that had nothing other than a sale of the truck constituted the transaction between plaintiff and defendant, there would be no liability on the part of plaintiff to the defendant for the loss of anticipated profits which he claims to have sustained because of the seizure of the truck.

This court, in *Feeney & Bremer Co., v. Stone,* 89 Or. 360 (171 P. 569, 174 P. 152), quoted from 2 Mechem on Sales, § 1757, as follows:

"The party who has broken his contract is liable to make compensation to the other for all such losses resulting from that breach as are either (1) the ordinary, the usual, the commonly to be expected consequences of such a breach of such contract; or (2) the peculiar or unusual consequences of the breach of the particular contract in question, if, under the circumstances, it can fairly be said that both parties had those consequences in their contemplation, at the time the contract was made, as a probable result of its breach; and if those unusual consequences are neither uncertain in their nature nor remote as to their cause."

■■ It will be observed from the above excerpt that the text writer clearly distinguishes between general and special damages, although he does not designate them by those terms. "The ordinary, the usual, the commonly to be expected consequences" of a breach of contract form the basis of general damages, such as are recoverable under § 64-707, supra. The damages sought in the case at bar are not based on the "ordinary, the usual, the commonly to be expected consequences" of a breach of contract, nor on a loss, as stated in § 64-707, subsection 6, "directly and naturally

resulting, in the ordinary course of events, from the breach of warranty". The loss of anticipated profits here sought to be recovered by the defendant falls within the second classification set out in the above quoted excerpt and is "the peculiar or unusual" consequence of the breach of the implied warranty of quiet possession incident to the sale of the truck. The defendant can not, however, recover for such loss, unless "it can fairly be said that both parties had those consequences in their contemplation at the time" the truck was sold, as a probable result of a breach of the warranty of quiet possession.

In Mariash on Sales, § 354, at pages 699 and 702, the author states:

"The allowance of special damages is generally limited to cases where the possibility of special damages was known to both of the parties at the time they made their contract, or were reasonably to be contemplated at that time. Special damages will not be allowed against a defendant who had no notice of the circumstances which might give rise to them. If the parties make an agreement knowing of circumstances which may create special damages on a breach, it is presumed that on making their contract they assume the obligation and the risk of such special damages which might naturally flow from a breach. A defendant will not be charged with such special or extraordinary damages of which he was wholly uninformed *when he entered into the contract.*

\* \* \* \* \*

"*It has been suggested that the defendant will be liable in special damages if he received notice that special damages will ensue at any time prior to the breach. This rule, we submit, is in error.* The notice of the potential special damages should have been within the contemplation of the parties when they made the contract, as otherwise it may be that the de-

fendant would not have assumed the burden of the contract, had he known in advance that special damages might result. The making of the contract in the light of the knowledge of the probability of special damages is an implied assumption of this risk.'' [Italics supplied.]

A clear and concise statement of the rules governing allowance of special or unusual damages is set forth in 8 R. C. L., §§ 64, 65 and 66, at pages 505–508, as follows:

"64. Profits in Contemplation of Parties; Proximity and Remoteness.—As in the case of damages for breach of contract generally, a recovery may be had for loss of profits when, and only when, the loss is such as might naturally be expected to follow the breach. Profits which would ordinarily, naturally, and in the usual course of things have been derived from performance, and the loss of which flows directly and naturally from the breach of the contract itself, may be recovered, since they are naturally incident to the contract, and may be fairly supposed to have been within the contemplation of the parties when it was made. *And so if they depend on special circumstances, it is essential to their recovery to show that such circumstances were known to the defendant when the contract was made.*

"65. Distinction between Remote and Certain Profits.—The line of distinction between profits which are remote, consequential, or not within the contemplation of the parties, and those which are proximate and absolute and certain, and within the contemplation of the parties, seems to rest in the question whether they are to arise directly out of the contract in question or its subject-matter, and to constitute the immediate fruits of the contract, or whether they are to result from collateral engagements or enterprises. Where the profit to be made was the inducement to the contract, such profit is the measure of damages. So a recovery may be had for the loss of profits which are the direct and immediate fruits of the contract itself.

Such profits are not to be regarded as consequential, remote, or speculative in character, but are regarded as part and parcel of the contract itself, entering into and constituting a portion of its very elements, something stipulated for, and the right to the enjoyment of which is just as clear and plain as to the fulfilment of any other stipulation.

";66. Profits of Collateral Contracts.—Loss of profits growing out of an existing collateral or subordinate agreement may be recovered where they were within the contemplation of the parties when the original contract was made, *but, as in other cases of special damage, the defendant must have had notice of the existence of such collateral contract at that time.* The recovery in such case is limited to a reasonable and fair profit, such as might reasonably have been in contemplation by both parties. Extraordinary and unusual profits can not be recovered even though the defendant knew of the collateral contract, unless he knew its terms, and hence knew that such a profit might be made. Profits are usually considered too remote, however, which are not the immediate fruits of the principal contract, but are dependent on collateral engagements and enterprises, not brought to the notice of the contracting parties, and not therefore brought within their contemplation, or that of the law. *Thus, no recovery can be had for loss of profits growing out of a subsequent collateral or subordinate undertaking which was entered into upon the faith of the principal contract, even though such profits are capable of definite ascertainment, and this is true though the defendant had knowledge of the existence of the collateral undertaking before the breach of the principal contract. Damages of this character are disallowed,* not because they can not be traced directly as the immediate and undoubted effect of the breach, but because they are in their nature uncertain and contingent, and are not such as would naturally flow from such a breach, and could not fairly be considered as having been within the contemplation of the parties at the time of entering into the contract." [Italics supplied.]

See, also, in this connection: *Hunt v. Oregon Pacific R. Co.,* 13 Sawyer 516 (36 Fed. 481, 1 L. R. A. 842); *Holloway & Bro. v. White-Dunham Shoe Company,* 151 Fed. 216, 10 L. R. A. (N. S.) 704; *Clyde Coal Company v. Pittsburgh & Lake Erie R. R. Co.,* 226 Pa. 391 (75 Atl. 596, 26 L. R. A. (N. S.) 1191); *Winslow Elevator & Machine Co. v. Hoffman,* 107 Md. 621 (69 Atl. 394, 17 L. R. A. (N. S.) 1130).

■ There is no contention by the defendant that his arrangement or so-called contract with Milne-Dussault Company entered into around September 1, 1930, was even being considered by him on July 9 preceding, the day when the truck was sold to him by the plaintiff. Therefore, the procuring of such contract by the defendant could not have been within the contemplation of the parties at or before the time of consummating the contract for sale of the truck. Nor is there any contention on behalf of the defendant that the plaintiff knew of his arrangement with Milne-Dussault Company until about September 5, 1930, when he began working for that company. The mere fact that the plaintiff learned or had notice of the Milne-Dussault agreement prior to the breach of warranty of quiet possession would in no wise add to plaintiff's liability for any loss of anticipated profits which the defendant might have suffered by reason of the termination of his employment by Milne-Dussault Company: 8 R. C. L., § 66, page 507. Any one who buys a truck not for resale could be expected to intend some use of it, and even had it been known to plaintiff that the defendant was expecting to use this truck in road construction employment only, that would not in any way enlarge the liability of the plaintiff for breach of warranty. The defendant did not plead or prove, as he was re-

quired to do to sustain his claim for damages, that it was reasonably within the contemplation of the parties at the time the truck was sold that the breach of implied warranty of quiet possession would result in the loss of anticipated profits here under discussion.

■ One of the reasons why loss of anticipated profits on a collateral contract entered into subsequent to the contract on which the action is based is not recoverable is that such profits would be speculative, indefinite and conjectural. The fallacy of attempting to predicate loss of anticipated profits on collateral undertakings not within the contemplation of the parties at the time the original contract was made was thus pointed out by the court in *Winslow Elevator & Machine Co. v. Hoffman,* supra, a case involving anticipated profits on future rental of a building:

"It is true that in this case the appellant knew at the time it made the contract that the elevator was to be installed in an office building; but it would seem to be clear, both upon reason and authority, that mere knowledge of that fact would not be sufficient to render it liable for the special losses claimed in this suit. To fix such a liability upon it, upon that ground alone,— and in this case there is no other upon which it can rest,—would be a startling and dangerous proposition. Under such a rule, the plumber, the gas fitter, the stair builder, or the machinist who defaulted in his contract to do certain work upon any of the great office buildings might be held liable for enormous special damages simply because he knew his contract had reference to such a building."

It is unnecessary here to discuss whether the loss, if any, suffered by the defendant due to the termination of his employment by Milne-Dussault Company, is capable of ascertainment, *i. e.,* whether such loss is sufficiently definite and not too speculative to permit

proof of its nature and extent, for the reason that that question is secondary to the determination of whether there is or is not any liability on the part of the plaintiff for damages, if any, suffered by the defendant through breach of the contract of hauling, and it is apparent that no such liability exists.

The following authorities which are relied upon by the defendant to sustain his contention that he is entitled to recover for the loss of anticipated profits on the collateral contract are based on entirely different facts from those in the case at bar and do not support his contention: *Hockersmith v. Hanley,* 29 Or. 27 (44 P. 497); *Feeney & Bremer Co. v. Stone,* supra; *Gary Coast Agency v. Lawrey,* 101 Or. 623 (201 P. 214); *American Oil Pump & Tank Co. v. Foust,* 128 Or. 263 (274 P. 322). They are, moreover, not in conflict with what has hereinabove been said or the authorities cited in support of this opinion.

 Error was committed by the trial court in admitting testimony and giving instruction as to loss of profits which defendant claims he would have made from the hauling arrangement with Milne-Dussault Company, were it not for the breach of warranty of quiet possession by the plaintiff. The plaintiff, however, was not entitled to a directed verdict, for the reason that there was contradictory evidence concerning its right to recover on the claim of $85.67 against the defendant, and for the further reason that the defendant was entitled to recover damages for the period during which he was deprived of the use of the truck.

The judgment appealed from should therefore be reversed and the cause remanded for further proceedings.

RAND, ROSSMAN, KELLY and BELT, JJ., concur.

BEAN, J. (dissenting.) On July 9, 1930, defendant purchase from plaintiff a GMC truck for the sum of $3,237.40, upon which a credit of $1,073.88 was given, and the balance was incorporated into a conditional sales contract, payable at the rate of $180.29 per month. This truck is designated as truck No. 2.

Plaintiff commenced this action to recover a balance alleged to be owing on the purchase price of the GMC truck. Defendant, by a counter-claim, sought to recover damages sustained through the loss of a contract for hauling highway surfacing material in the performance of which defendant was engaged and under which he was using his truck, when on October 6, 1930, it was seized by the sheriff of Tillamook county, Oregon, in proceedings for foreclosure of a lien, which lien was on the truck and known to the plaintiff at the time it sold the truck to defendant. The truck was released on October 10, 1930. The cause was tried to the court and a jury and a verdict was rendered in favor of defendant in the sum of $1,000. From a resulting judgment, plaintiff appeals.

The truck was sold to defendant on contract as being free of encumbrances. Plaintiff, at the time of the sale, when defendant secured and undertook performance of his contract for hauling the highway surfacing materials and at the time of the seizure of the truck and dispossession of the defendant, knew of the existence of the lien upon the truck. Plaintiff knew that defendant purchased the truck for the purpose of hauling highway surfacing material. The contract of purchase called for monthly payments. Defendant used the truck upon various contracts and was dependent upon such contracts to produce funds with which to pay for the

truck. Plaintiff knew this and followed defendant's work quite closely.

Defendant, shortly prior to September 5, 1930, secured a contract from Milne-Dussault Construction Company to furnish two trucks, one of which was truck No. 2, and the other was a truck previously purchased from plaintiff for hauling highway surfacing materials from the crusher to points along the Oregon Coast highway between Neskowin and Otis. Plaintiff knew that defendant had secured the Milne-Dussault Company contract and that defendant was required to furnish two trucks under his contract and that truck No. 2 was one of the trucks that defendant proposed to use, and in fact was using in the performance of said contract. Prior to the seizure of the truck defendant had worked on his contract for about one month. At the time defendant was dispossessed of truck No. 2 he was not in default under his contract to purchase. By the seizure of the truck defendant was dispossessed of it and was unable to furnish the two necessary trucks required under his contract. The contract was terminated by Milne-Dussault Company and defendant lost his job. Later plaintiff repossessed the truck and sold it.

The testimony indicated that the sheriff instructed the state police officer to hold Sears' truck and the police officer understood that both of the trucks were to be held, and truck No. 1, on account of the confusion, was kept off the work for a day or two, but was released and worked about two days before truck No. 2 was released. The testimony tended to show that on account of the seizure of truck No. 2 defendant was unable to proceed with his contract and lost his job.

Plaintiff warranted to defendant that defendant, as buyer, would enjoy quiet use and possession of the truck as against any lawful claims existing at the time of the sale thereof and that the truck was free from any charge or encumbrance in favor of any third person. § 64-313, subds. 2 and 3, Oregon Code 1930; *Latture Co. v. Gruendler Co.*, 133 Or. 421 (289 P. 1067). The provisions of section 64-313, which raised an implied warranty of title, read as follows:

"In a contract to sell or a sale, unless a contrary intention appears, there is: * * * (2) An implied warranty that the buyer shall have and enjoy quiet possession of the goods as against any lawful claims existing at the time of the sale. (3) An implied warranty that the goods shall be free at the time of the sale from any charge or encumbrance in favor of any third person, not declared or known to the buyer before or at the time when the contract or sale is made. * * *"

These warranties, as provided by the statute, became a part of the contract between the parties. Both were breached and violated by plaintiff, and upon such a breach of warranty defendant is entitled to recover the damages he sustained. § 64-707, subds. 1-b and 6, Oregon Code 1930; *Hockersmith v. Hanley*, 29 Or. 27 (44 P. 497); *Feeney & Bremer Co. v. Stone*, 89 Or. 360 (171 P. 569, 174 P. 152); *Gary Coast Agency, Inc. v. Lawrey*, 101 Or. 623 (201 P. 214); *American Oil P. & T. Co. v. Foust*, 128 Or. 263 (274 P. 322).

It was incumbent upon defendant to show that the loss was within the contemplation of the plaintiff or that it could be reasonably presumed to have been within the contemplation of plaintiff at the time of the sale of the truck to defendant. *Feeney & Bremer Co. v. Stone,* supra. We think the defendant fairly

complied with this rule. In *American Oil P. & T. Co. v. Foust,* supra, the syllabus reads thus:

"Defaulting seller must compensate his buyer with such damages for breach of warranty as may fairly and reasonably be caused, either as arising naturally from the breach or such as may reasonably be supposed to have been in contemplation of the parties when they made the sale as the probable result of its breach."

In *Feeney & Bremer Co. v. Stone,* supra, at page 370, a case in which the warranty of a hoist was involved, we find the following language of Mr. Justice HARRIS:

"The theory of the law is to award compensation for gains prevented and for losses sustained. The party who is damaged by the breach of a contract is not prevented from recovering anticipated profits merely because they are such. If it is reasonably certain that the breach of a contract has deprived the complaining party of a profit which was contemplated or can reasonably be presumed to have been contemplated by the parties at the time the contract was made then the party committing the breach is liable for the loss of the profit."

In the opinion on rehearing, at page 381, Mr. Justice BURNETT, in discussing the question of the loss occasioned by the hoist not doing the work, said:

"It is not like a contract for services which the complaining party was prevented from performing. Without having parted with the commodity, he is in a situation, so far as damages are concerned, analogous to that of a seller whose buyer refuses to take the goods for which he contracted." See *Keystone Drilling Co. v. Stahl,* 17 Pa. Co., 498; 55 C. J. 982, Note 95 (a).

If plaintiff knew, as the testimony tended to show that he did, that defendant intended to use the truck for the purpose of hauling highway surfacing material,

then the parties contemplated that a breach of warranty would result in a loss to the defendant. If defendant lost the benefit of his contract and lost profits on account of being unable to proceed therewith and deliver material on the highway, the loss would be the proximate consequence of the breach, as the loss can be reasonably said to have been within the contemplation of the parties at the time they made the contract and the profits are not conjectural but are capable of being ascertained. Therefore the defendant is entitled to compensation: *Feeney & Bremer Co. v. Stone*, supra.

The testimony of Sears shows that he had an opportunity to obtain a contract for work on the Bend-Burns highway with two trucks. He had one truck and went to see plaintiff to ascertain if "they" had any one that would go with him on the job. Apparently there was no one to do so. "They" suggested that plaintiff buy another truck "and take it up there with me". Sears had purchased the first truck from plaintiff. He states:

"A. * * * Well, I mentioned the fact that I didn't like to do that because that would jeopardize the other truck, especially buying on contract, but they assured me that there wouldn't be anything go wrong with the other truck if I did buy it. * * *

"A. I was there the second day before I finally agreed to buy the other truck. * * *"

This testimony tends to show that defendant thoroughly understood, at the time of the sale of truck No. 2, that Sears was intending to use the two trucks for hauling material on the highway at a considerable distance from the market for trucks and at a place where he could not borrow a truck to replace one for a few days, and that it was in the contemplation of the parties that Sears would use two trucks hauling

surfacing material on the highway on any job he could get. Indeed plaintiff states in its brief:

"What did appellant know at the time of this sale? It knew that respondent was going to use this truck for hauling on a Bend-Burns highway job and it could be reasonably presumed to know that respondent would use the truck on any other hauling job he could get. * * *".

The testimony also indicates that plaintiff knew defendant was going to use the two trucks, one the same as the other. Sears testified that after he worked on the Bend-Burns highway, and on another contract, "Then I secured this verbal contract from Mr. Milne to work that winter and as long as he could use me". Mr. Milne, of Milne-Dussault Construction Company, testified:

"Q. Tell the jury how long his work was to last when you hired him?

"A. As far as I recall when we talked over going to work we had approximately two months to finish our job, the surfacing end of it. * * *

"Q. Did you have other contracts at that time?

"A. Yes, I did * * *

"Q. Were Sears' trucks such trucks as were satisfactory for use on such jobs?

"A. Oh, yes, they were practically the same.

* * * * *

"Q. Mr. Milne, at the time you employed or hired or gave Mr. Sears this contract for hauling what was said as to how long he might expect to work for you?

"A. I can't recall just how long I told him; it is a long time back and I can't remember, but we had two months work down there on the coast, or approximately that on the job, and I think I told him we could use him somewhere around that time down there."

We quote further from *Feeney-Bremer Co. v. Stone*, supra:

"His mere expectation that the county and the other party would apply to him for gravel manifestly would not be a basis for damages. He must go further and show that they actually contracted to buy from him a specified quantity of that material at a stated price, *or that in good faith they offered to make such an agreement* and that he was compelled to decline the offer because the hoist in question would not do the work." (Italics ours.)

In the present case Sears had a contract for hauling gravel and was engaged in so doing when the truck was seized.

Again, we read, on page 380 of the Feeney-Bremer case:

"It is not enough that he had prospects of contracting with the parties named. He must have had hold enough upon them to give rise to some degree of certainty within the meaning of the cases cited."

As to the intention to seize only one truck, while the other was seized and taken off the work for about two days, it would be much the same as though a man had a contract for plowing with a team of two horses and one of them should be wrongfully attached and he was hindered from carrying on his work and could not do the plowing with one horse. We think he should obtain compensation for the two for such time as he was prevented from continuing his plowing.

Plaintiff argues that the defendant was under a duty to find other work for the trucks, if possible, in order to mitigate any damage he might claim. The Milne-Dussault Company had other highway work, but the testimony distinctly shows that when Sears asked

them if the matter could not be fixed up some way, so he could go on with the work, they plainly told him that they did not want him any longer on account of the truck being seized. They evidently expected it to be a monthly matter. Sears stated that he could not obtain another job until the next summer. The jury had no reason to find that defendant could have obtained other work. It was a crucial time.

Plaintiff contends that the defendant's anticipated profits were too problematical and conjectural. The rule, that damages which are uncertain or conjectural can not be recovered, does not apply to an uncertainty as to the amount of the benefit or gain to be derived from performance, but to an uncertainty or contingency as to whether any such gain or benefit would be derived at all. *Bredemeier v. Pacific Supply Co.*, 64 Or. 576 (131 P. 312); *Blagen v. Thompson*, 23 Or. 239 (31 P. 647, 18 L. R. A. 315); *Smith v. Pallay*, 130 Or. 282 (279 P. 279); *Shannon v. Shaffer Oil & Ref. Co.*, 51 F. (2d) 878 (78 A. L. R. 851), and extended notes to same, 858, et seq.

Plaintiff knew that there was a lien on the truck sold to defendant and expected that the truck would be seized, yet took no step to protect the defendant. Plaintiff must have realized at the time that if the truck was seized the defendant would be damaged in the loss of his work on the highway and could not expect that the work on the highway would be stopped or retarded by the loss of the use of the truck without the defendant being damaged. That was certain. The only uncertainty in regard to the matter is as to the amount of damages, and the amount was shown as plainly as could be in any damage case. Damages are usually an estimate.

. There is practically no question in regard to the law. The divergence of opinion is in relation to the application thereof, and to hold that defendant was not entitled to damages for loss of profits in the present case would be tantamount to holding that one can not ever recover for loss of profits, which is not the law.

The New York court, in *Wakeman v. Wheeler & W. Mfg. Co.*, 101 N. Y. 205 (54 Am. Rep. 676, 4 N. E. 264, 78 A. L. R. 860), which frequently has been referred to as an important authority in the cases on the present subject, said in part:

"But when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not . be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain."

We find in an annotation on the subject in 78 A. L. R. 863:

"Absolute certainty as to damages sustained is, of course, in many cases impossible; all that the law requires is that such damages be allowed as, in the judgment of fair men, directly and naturally resulted from the injury for which suit is brought. Hetzel v. Baltimore & O. R. Co. (1898) 169 U. S. 26, 42 L. Ed. 648, 18 S. Ct. 255."

In *American Oil P. & T. Co. v. Foust*, supra, Mr. Justice ROSSMAN, at page 272, says:

"But it is to be observed that, in our case, there was substantial evidence to the effect that the plaintiff knew that the defendant expected to use this device in the operation of a business for profit. In such instances, where the loss of profits in the event of a

breach, was within the contemplation of the parties, a recovery limited to the rental value of the device may not compensate fairly for the loss sustained during the period while an efficient machine is being substituted for the defective one; the loss profits are sometimes recoverable.''

Evidence was introduced by defendant, and practically undenied by plaintiff, to show the profits he had derived from his contract during the period of practically one month when he had performed the same and up to the time when he lost it. Such damages may be proven by demonstration of past transactions under the contract involved. *Williams v. Island City M. & M. Co.*, 25 Or. 573 (37 P. 49); *Fields v. Western Union*, 68 Or. 209 (137 P. 200); *American Oil P. & T. Co. v. Foust*, supra.

It is urged, but not by plaintiff, that the defendant did not allege that the loss was within the contemplation of the seller, or must have been reasonably presumed to have been within the contemplation of the seller at the time of the sale. Defendant alleged in his answer:

''that at the time of such purchase, July 9, 1930, plaintiff knew that defendant proposed to use said truck for hauling under contracts for highway construction and surfacing and knew that defendant would be obliged to have the quiet, uninterrupted use and enjoyment of the possession of said truck in order to perform such truck hauling contracts * * *.''

We do not understand that it is necessary for defendant to allege the facts in the exact language of the law, as stated above, but facts and circumstances should be set forth to show that plaintiff had knowledge of the same so that it would be reasonably pre-

sumed to have been within its contemplation at the time of the sale. We think that the allegation in regard to damage was sufficient, particularly after verdict and judgment.

The requirement that, in order to charge with liability under special circumstances, the party sought to be charged shall have had notice of such circumstances, should receive reasonable interpretation with reference to the subject to which such notice is applied. As a general rule, knowledge of the special circumstances must be brought clearly home to him at the time when the contract is made, in such a way that he must know that the person with whom he is contracting reasonably believes that he accepts the contract with the special conditions. It is not required that he must have exact knowledge or information in detail as to just what loss will result, nor is it essential that such special conditions be mentioned in the negotiations or included in the contract in express terms. It is sufficient if they are known to the parties or are of such character that they may be fairly supposed to have been in contemplation in the making of the contract. 8 R. C. L. 461, § 28. No hard and fast rule for ascertaining the profits, for the loss of which a recovery may be had, can be laid down. They must be determined according to the circumstances of each particular case and the subject matter of the contract. 8 R. C. L. 504, § 63.

In the present case the testimony indicated that Sears had a contract with the Milne-Dussault Company, which was in existence and being performed when he lost it through plaintiff's breach. Unquestionably the defendant was damaged. He lost something

that was in existence, namely, a valid contract, from which he had been deriving profits and which he showed, to the satisfaction of the jury, would have produced further profits.

Plaintiff stresses the fact that truck No. 1 was taken off the work by the sheriff by mistake and contends that if defendant had worked one of his trucks he would probably not have lost his job. The testimony shows that truck No. 1 was back on the work and was used about two days before truck No. 2 was released, and defendant was informed that on account of truck No. 2 being tied up they did not want his services any longer. It all occurred in regard to the foreclosure of the lien upon truck No. 2 purchased by defendant from plaintiff. The jury might well find from the testimony that truck No. 1 cut no particular figure in the transaction, and we think the trial court properly instructed the jury to that effect.

Plaintiff contends that when it made its warranty good and returned the truck to defendant, and defendant accepted the same, the only damages recoverable against plaintiff would be the loss of the use of the truck for the time defendant was out of possession, citing 55 C. J. 784-6; 24 R. C. L. §§ 506, 507; *Lee v. Woods*, 161 Ky. 806 (171 S. W. 389); *Close v. Crossland*, 47 Minn. 500 (50 N. W. 694); *Mauldin v. Milford*, 127 S. C. 508 (121 S. E. 547). But the crux of the matter is that during the interim between October 6, 1930, and October 10, 1930, while plaintiff was dispossessed of his truck, he lost his job hauling surfacing material, or, in other words, the egg was broken and the damages were inflicted during that time.

When a man is injured by the breach of a contract which he has made with another party, he is entitled

upon principle to recover damages commensurate with the injury he has sustained. The theory of the law is to award compensation for losses sustained. *Hockersmith v. Hanley*, supra; *Feeney & Bremer v. Stone*, supra. Section 64-707, subd. (6) reads: "The measure of damages for breach of warranty is the loss directly and naturally resulting, in the ordinary course of events, from the breach of warranty." It is said by Mr. Justice Wolverton in *Hockersmith v. Hanley*, supra, page 38:

"A person injured by the breach of a contract to which he has become a party with another is entitled, upon principle, to recover damages commensurate with the injury he has sustained, and this will include gains prevented as well as losses sustained."

The testimony strongly indicated that defendant, by reason of the seizure of the truck, lost his contract, and, as a natural and usual result, was damaged. The testimony also tended to show, as conclusively as possible in a matter of this kind, the amount of the profits that defendant could have made had he retained his job, and that he would have retained it during the continuance of the work in which he was engaged; also, the testimony showed the gross earnings of the trucks, the expenses to run the same, the price received per yard and the usual amount carried.

The question is impliedly raised as to the indefinite time of defendant Sears' contract with the Milne-Dussault Company for work with his trucks. A contract of that nature is discussed in 4 Page on Contracts, §§ 2421 and 2422, on the question of the enforcible character of a contract in connection with interference by one party with a contract between two others. It is there stated, in effect, that in regard to

the existing contracts which can be terminated at the option of one party thereto, the question is presented whether interference whereby such person is induced to exercise such option is a tort. The weight of authority is that such conduct amounts to a tort if interference with a contract not voidable at the option of the party would be a tort. The plaintiff, by breaching its contract, interfered with defendant's contract with Milne-Dussault Company for hauling highway surfacing material.

Plaintiff must be presumed to have known that if defendant was not able to have the quiet possession and use of the truck in the performance of a secured contract in his business, hauling highway material, by reason of plaintiff's breach of warranty of the title to the truck, he would lose his contract and sustain damages measured by lost profits under his contract. It was incumbent upon defendant to show that he would have performed under the contract, and we think he sustained this burden of proof.

There was no error in the court overruling the motions of plaintiff for a dismissal of defendant's counterclaim, for a directed verdict and for a new trial.

Finding no error in the record, the judgment of the circuit court should be affirmed.

CAMPBELL, C. J., concurs in this opinion.